UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| RUN THEM SWEET, LLC, a California limited liability company, on behalf of themselves and those similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>CPA GLOBAL LIMITED, a foreign entity formed under the laws of the Island of Jersey, Channel Islands, and CPA GLOBAL NORTH AMERICA LLC,<br><br>    Defendants | CIVIL ACTION NO.: 1:16-01347-TSE-TCB<br><br>FIRST AMENDED CLASS ACTION COMPLAINT FOR:<br><br>(1) Breach of Contract;<br>(2) Breach of Contract-Breach of Implied Covenant of Good Faith and Fair Dealing;<br>(3) Fraud by Concealment;<br>(4) Unjust Enrichment;<br>(5) Violation of the Virginia Advertising Law, VA Code Ann. §§ 8.01-40, 18.2-216 *et seq.*, 59.1-68.3; and<br>(6) Injunctive Relief.<br><br>__DEMAND FOR JURY TRIAL__ |

Plaintiff Run Them Sweet, LLC ("RTS" or "Plaintiff"), on behalf of itself and all other similarly situated persons and/or entities, brings this action against Defendants CPA Global Limited and CPA Global North America, LLC (together, "CPA" or "Defendants"), and alleges, upon personal knowledge as to its own conduct, and upon information and belief as to the conduct of others, as follows:

## NATURE OF THE ACTION

1. Plaintiff RTS is a medical diagnostics company.  RTS holds United States and foreign patents and patent applications (the "Patents").  To maintain the registration of these Patents, RTS must pay renewal fees to the patent offices in each country where the Patents are registered.

2. To manage these payments, RTS contracted with CPA, which agreed to handle the

payments in exchange for a fixed fee per payment.

3.       Under the contract attached hereto as Exhibit "A" ("Agreement"), CPA agreed to charge RTS its fixed fee in addition to its actual costs of making payments.

4.       However, CPA substantially overcharged RTS in violation of the Agreement.

5.       To hide this overcharging, CPA issued opaque invoices to RTS that are devoid of any meaningful breakdown.  This made it difficult for RTS to determine the actual costs CPA incurred in making payments, and thus difficult to tell if RTS was being overcharged.

6.       On information and belief, Defendants use similar contracts and pricing structures for all or nearly all of their clients, and CPA overcharges their clients according to a systematic scheme.

7.       RTS brings this class action lawsuit on behalf of all Defendants' U.S. clients who have been injured by Defendants' systematic overbilling practices.  Plaintiff seeks classwide damages, equitable relief, and injunctive relief.

## JURISDICTION AND VENUE

8.       This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because at least one Plaintiff or class member is from a different state than at least one Defendant, there are more than 100 members of the class and the aggregate amount in controversy exceeds $5,000,000, exclusive of attorneys' fees, interest, and costs.

9.       Defendants are subject to personal jurisdiction because Defendant CPA Global Limited conducts substantial business in the Commonwealth of Virginia directly and through its affiliate Defendant CPA Global North America, LLC, such that they have significant, pervasive and substantial contacts with the Commonwealth of Virginia.

10.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and pursuant to a

choice of venue clause, which this Court has found to be applicable to the dispute. Specifically, Plaintiff's contract, and the contracts of many class members, contains a Virginia choice of venue clause and a Virginia choice of law clause.

## PARTIES

11.     RTS is a limited liability company duly organized under the laws of the State of California, having its headquarters and principal place of business in San Francisco, California.

12.     Defendant CPA Global Limited is a foreign entity organized under the laws of the island of Jersey, Channel Islands, with its headquarters and principal place of business located on the island of Jersey, Channel Islands. Defendant transacts business in the Commonwealth of Virginia by offering for sale and selling its services to customers in Virginia and in this District. CPA's website states prominently: "The World's Most Trusted Patent Renewals".[1]

13.     Defendant CPA Global North America, LLC, is an entity formed under the laws of the State of Delaware and, on information and belief, is the U.S. affiliate of CPA Global Limited. On information and belief, CPA Global North America, LLC, maintains an office in San Mateo, California and, at all relevant times for purposes of this Complaint, Defendant has done substantial business in the State of Virginia.

## FACTUAL ALLEGATIONS

14.     Plaintiff RTS is a U.S. medical diagnostics company. RTS owns Patents which must be periodically renewed to maintain and protect RTS's intellectual property rights. To maintain the registration of these Patents, RTS must pay renewal fees (also called maintenance or annuity fees) to the patent offices in each country where the Patents are registered.

---

[1] *See* Official Website of CPA Global ("CPA Global Website"), *available at* https://www.cpaglobal.com/for-corporates/ip-services/renewals/patent-renewals/ (last visited January 12, 2017).

15.     Such renewals require the payment of certain fees to, and may require the filing of documents with, patent offices in each country in which Plaintiff has registered Patents.  Timely renewal of patents in each country is vital because patents are lost or abandoned if not properly renewed.

16.     CPA is the market leader in providing patent renewal services.[2]  It is a large, multinational company with twenty-six offices, including an office in San Mateo, California near where RTS is located, and more than 900 in-house attorneys across four continents and twelve countries.[3]  CPA renews more than 1.6 million patents and trademarks annually.[4]  CPA was acquired by the Private Equity firm Cinven in 2012.[5]

17.     The charges to clients are set by a pricing committee in the Isle of Jersey.

18.     CPA's standard policies for billing clients include marking up the foreign agent fees, or "country charges" that are required in some countries, and using invented foreign exchange rates that are much higher than market rates under the guise of shielding the client from fluctuations in the currency markets.

19.     These practices, as well as others that CPA engages in, are unlawful.

**CPA's Misrepresentations to the Public**

20.     CPA maintains a publicly available website advertising its patent renewal services.[6]

---

[2]   *See* CPA Global Website, *available at* https://www.cpaglobal.com/who-we-are/ (last visited January 12, 2017).
[3] *See* CPA 2015 Business Strategy Review, available at https://www.cinven.com/lib/docs/121923-cpa214132015 annualreview.final.pdf (last visited January 12, 2017).
[4]  *Id.*
[5]  *Id.*
[6]   *See* CPA Global Website, *available at* https://www.cpaglobal.com/for-corporates/ip-services/renewals/patent-renewals/ (last visited January 12, 2107).

21.     On the website, under "Patent Renewal" CPA promises:

Upfront projection of the full cost of renewals with **no hidden extras** and certainty of final invoiced amounts once instructions are received.

(emphasis added).

22.     This representation is false.  CPA's bills contain hidden charges.  CPA charges more than it promises by billing clients more than CPA's costs plus its agreed upon fee.

23.     CPA's overbilling consists of:

a.      padding supposedly "pass through costs" and keeping the extra margin;

b.      outright billing clients for costs that CPA does not actually pay to maintain the patent;

c.      using its own invented foreign exchange rates that are much higher than market rates and pocketing the difference, or

d.      incorporating inappropriate charges to its invoices.

24.     With respect to currency conversion, CPA also promises on its website:

Billing in the currency of your choice **removing the cost** and complexity of handling multiple currency transactions across jurisdictions and exposure to currency fluctuations.

(emphasis added).

25.     This representation is also false.  A reasonable consumer would believe that CPA is offering to mitigate the risk of currency fluctuations.  However, CPA uses its own invented and unreasonable exchange rates, which are usually 20 to 40% higher and sometimes more, for the purposes of client billing and actually increases the clients' costs.

26.     CPA also touts "better cost and budget control" and "customizable budget reports projecting all associated renewal fees for the lifetime of your patent portfolio."

27.     These representations are misleading because a reasonable consumer would expect that the costs of patent annuities in the future would be reasonable and predictable, not that CPA

would inflate its bills and fail to provide invoices with detailed charges

28.     CPA's website also assures the public that it operates "with honesty, integrity and accountability."[7]

29.     This representation is false.  Reasonable consumers would not view CPA's practice of overbilling and providing only opaque invoices as operating with "honesty, integrity and accountability."

30.     CPA also distributes a brochure to the public entitled "PATENT RENEWALS Realizing Value."  The purpose of the brochure is to advertise and promote CPA patent renewal services.

31.     This brochure again touts the transparency of its billing:

Providing access to online management tools where you can track and monitor payment activity and run budget/cost forecast reports.

32.      This representation is false because due to the overcharges and opaque billing, clients cannot "run budget/cost forecast reports" accurately.

33.     The brochure also offers CPA's service of "Managing complex international currency transactions and funding the payment of official fees."

34.     This statement is misleading because no reasonable consumer would understand that the management of "complex international currency transactions" includes paying outrageously inflated exchange rates.

**CPA's Standard Contract Terms**

35.     RTS entered into the Renewal Service Agreement ("Agreement") with CPA on March 18, 2016.

---

[7]*See* CPA Global Website, *available at* https://www.cpaglobal.com/who-we-are/ (last visited January 12, 2017).

36. The terms of the Agreement are standard for CPA's clients.

37. The Agreement set forth the terms on which CPA would renew RTS's patents. Section 5.1 of the Agreement states that:

> Our basic fees in relation to Services that comprise the provision of renewal of intellectual property rights registrations are set out in Clause 4 of the Operating Procedures.

38. Clause 4 of the "Operating Procedures" states that: "We will charge you an administration charge based on Schedule 1, attached."

39. Schedule 1 sets forth a list of "Administration Charges" based on the number of annual payments the client makes. The more annual payments, the lower the per-patent Administration Charge.

40. The Administration Charge was agreed to be the only charge imposed by CPA for its services. The rest of the charges were agreed to be costs passed on to clients by CPA.

41. The next section, Section 5.2, states that:

> In addition to our fees there will be also be payable by you the charges made by the relevant registries ("Official Fees") in each jurisdiction and which vary from time to time and, where applicable "Country Charge" [sic] which is set out in a tariff (which may vary from time to time), a current copy of which is available on request.

42. However, CPA bills its clients for more than just the Official Fees and Country Charges, or artificially inflates these charges.

43. Section 5.3 of the Agreement further states that when currency must be exchanged, such currency will be "converted at our rates from time to time."

44. But these rates are far in excess of any reasonable exchange rate on the relevant dates.

**The Overbilling of RTS**

45. When RTS was invoiced by CPA it was for amounts far in excess of what RTS

should have been charged based on the Agreement. (*See* attached <u>Exhibit "B"</u>).  The invoices did not even correspond to CPA's own fee schedule.

46.     In addition, the invoices only provided a total amount due for each renewal.  They failed to give any details, explanations, or itemizations.

47.     For example, an invoice sent to RTS by CPA in July of 2015 charged RTS $1006.63 for a renewal in Europe.  The invoice did not list a breakdown of the charges.  This is standard CPA practice.

48.     According to the schedule provided by CPA, the Administrative Fee charged by CPA would be $200, leaving $806.63 in other charges.  The European Patent Office renewal fee was €465 (Euros).  On the date of the invoice, the exchange rate was roughly $0.908 Euros to one U.S. Dollar,[8] which would yield a U.S. Dollar cost for the foreign patent office fee of $512.11.

49.     There are no agent fees, country fees, or other fees associated with renewal in the European Patent Office.

50.     According to the contract, RTS should have been charged $712.11 but was charged, and paid, $1006.63.  This is $294.52 more than it should have been charged.

51.     For another renewal in Canada, RTS was charged, and paid, $686.68.

52.     According to the schedule provided by CPA, the Administrative Fee charged by CPA would be $200, leaving $486.68 in other charges.  According to the rates charged by the Canadian patent office, the "Official Fee" was $100 Canadian.  On the date of the invoice, the exchange rate was roughly $1.28 Canadian to one U.S. Dollar,[9] which would yield a dollar cost for the foreign patent office fee of $78.13.

---

[8] *See* Official Website of X-Rates ("X-Rates Website"), *available at*  http://www.x-rates.com/average/?from=USD&to=EUR&amount=1&year=2015 (last visited January 12, 2017).
[9] *Id. available at* http://www.x-rates.com/average/?from=USD&to=CAD&amount=1&year=2015 (last visited January 12, 2017).

53.     In addition, there is an agent fee required in Canada of approximately $125 Canadian (ostensibly, the "Country Charge").  On the date of the invoice, $125 Canadian would be approximately $97.65 USD.

54.     Adding the "Official Fee" and the estimated "Country Charge" to CPA's $200 Administrative Fee equals $375.28.

55.     Accordingly, under the contract, RTS should have been charged approximately $375.28, but was charged, and paid, $686.68.  This is $311.40 more than it should have been charged.

56.     The invoices received by RTS and the members of the Class do not contain a breakdown of charges.  This opacity is an unfair practice which makes it impossible for members of the Class to find any explanation for these overcharges.

## CLASS ACTION ALLEGATIONS

57.     RTS brings this action as a class action pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of the following class (the "Class"): All persons or entities in the United States who entered into a Renewal Service Agreement using Defendants' standard agreements.

58.     Excluded from the Class are: (i) Defendants and its employees, principals, affiliated entities, legal representatives, successors, and assigns; (ii) any entity in which Defendant has a controlling interest, and Defendants' legal representatives; (iii) the judges to whom this action is assigned and any members of their immediate families; and (iv) any member of the Class who timely elects exclusion.

59.     RTS reserves the right to amend or modify the definition of the Class with greater specificity or further division into subclasses as discovery and the orders of this Court warrant.

60.     **Numerosity.**  Rule 23(a)(1).  The members of the Class are each so numerous that

their individual joinder is impracticable.  The proposed Class contains thousands of members.  The true number of Class members can be ascertained through information and records in Defendants' exclusive possession, custody or control.

61.     **Commonality.**  Rule 23(a)(2).  There are questions of law and fact common to the Class, which predominate over any questions which may affect only individual members of the Class, including but not limited to the following:

(a)     Whether Defendants engaged in a scheme to overcharge clients;

(b)     Whether Defendants breached the Renewal Service Agreements with Plaintiff and the Class by systematically overcharging Plaintiff and the Class;

(c)     Whether Defendants have inappropriately applied "Country Charges", and whether Defendants "added undisclosed margins or fees to Country Charges;

(d)     Whether Defendants inflated their own "Administrative Charges";

(e)     Whether Defendants inflated the "Official Fees";

(f)     Whether Defendants inappropriately, unfairly, or without adequate notice billed clients for CPA's late or urgency charges;

(g)     Whether Defendants inappropriately applied third party late or urgency charges, and whether Defendants added undisclosed margins or fees to third party late or urgency charges;

(h)     The nature of the "Funds management charge", whether this charge was disclosed and agreed to by clients, whether it was inappropriately or unfairly applied, and whether it was excessive;

(i)     Whether the exchange rates charged by Defendants are unlawfully

excessive under the contracts;

(j)     Whether Defendants made misrepresentations to the public on its website and its brochures;

(k)     Whether Defendants' failure to provide detailed and transparent invoices violates their implied duty of good faith and fair dealing;

(l)     Whether Defendants' acts and practices constituted fraud;

(m)     Whether Defendants have been unjustly enriched through their unlawful conduct;

(n)     Whether Defendants' acts and practices violated Virginia's false advertising law, Va. Code Ann. § 18.2-216; and

(o)     Whether declaratory, equitable, or injunctive relief should be appropriately awarded to the Plaintiff and the Class.

62.    **Typicality.**  Rule 23(a)(3).  RTS's claims are typical of the claims of the members of the Class, because Plaintiff's and the Class's claims arise out of the same course of conduct by Defendants and are based on the same legal theories.  Plaintiff and the members of the Class were overcharged, deceived, and subjected to an unfair business practice in the same manner in their transactions with Defendants, and their injuries are a direct proximate result of the same wrongful overbilling practices.

63.    **Adequacy of Representation.**  Rule 23(a)(4).  RTS will fairly and adequately protect the interests of the Class because its interests do not conflict with the interests of the members of the Class it seeks to represent.  RTS has retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously.

64.    **Predominance and Superiority.**  Rule 23(b)(3).  Questions of law and fact common to the Class predominate over individual issues.  Resolution of the questions listed in ¶

61, *supra*, will advance the litigation on behalf of all Class members.  Individual issues are likely limited to the amount of damages each member of the Class sustained.

65.     A class action is superior to other methods of litigating this dispute.  The monetary damages and other pecuniary losses suffered by individual members of the Class are relatively small compared to the burden and expense that would be entailed by individual litigation of claims against the Defendants.  It would thus be virtually impossible for the members of the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  As such, individual members of the Class do not have a strong interest in controlling the prosecution of separate actions.  Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issued raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.   Plaintiff knows of no other litigation addressing this issue on a classwide basis.

66.     **Declaratory and Injunctive Relief.**  Rule 23(b)(1) and (b)(2).  In the alternative, the Class may also be certified because:

(a)     The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

(b)     Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive

relief with respect to the members of the Class as a whole; and/or

(c)    Certification of specific issues such as Defendants' liability is appropriate.

65.    Adequate notice can be given to the Class directly using information maintained in Defendants' records or through notice by publication.

66.    All Class members have been damaged in a similar fashion by the same conduct. The degree of damages suffered by individual members is calculable according to an ascertainable formula.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Breach of Contract)

67.    Plaintiff re-alleges and incorporates by reference each preceding paragraph as though set forth at length herein.

68.    Defendants entered into written contracts with Plaintiff and the Class for renewal of patents.

69.    Plaintiff performed all obligations under the contract by paying all invoiced fees and charges associated with the renewal of its patents.

70.    All conditions required by the contract for Defendants' performance occurred.

71.    Defendants breached these contracts by, among other things: (i) overcharging Plaintiff and the Class for services provided under the contract in excess of agreed upon rates outlined in Defendants' fee schedule, (ii) invoicing Plaintiff and the Class in an opaque manner, and (iii) concealing both the types of fees and the specific amount of fees it charged Plaintiff and the Class.

72.    Defendants' breaches of contract caused actual damages to Plaintiff and the Class. Plaintiff and the Class suffered pecuniary damages as a result of Defendant's breach of contract,

and were forced to expend substantial time, effort, and money in the attempt to determine the extent of Defendants' overbilling.

73.     Therefore, Plaintiff and members of the Class have suffered compensatory, incidental, and consequential damages.

## SECOND CAUSE OF ACTION

### (Breach of Contract-Breach of Implied Covenant of Good Faith and Fair Dealing)

74.     Plaintiff re-alleges and incorporates by reference each preceding paragraph as though set forth at length herein.

75.     Defendants entered into written contracts with Plaintiff and the Class for renewal of patents.

76.     Virginia law recognizes an implied covenant of good faith and fair dealing in contracts.

77.     CPA acted in its discretion and in bad faith by overcharging clients in the manner described above.

78.     CPA acted in its discretion and in bad faith by billing clients in an opaque manner to hide its practice of overcharging clients.

79.     As a result, Plaintiff and the Class have been damaged.

## THIRD CAUSE OF ACTION

### (Fraud by Concealment)

80.     Plaintiff re-alleges and incorporates by reference each preceding paragraph as though set forth at length herein.

81.     Defendants intentionally concealed and misrepresented material facts concerning the Renewal services Agreements entered into by each member of the Class.

82.     Plaintiff and each member of the Class reasonably relied on Defendants' false

representations and upon their otherwise accurate representations that were rendered materially misleading by their intentional concealment and failure to disclose the material facts mentioned above.

83.     Defendants' misrepresentations and representations that became misleading due to intentional concealment of the facts were material to the purchasing decisions of Plaintiff and the other members of the Class.     Specifically, these misrepresentations an acts of intentional concealment induced Plaintiff and the other members of the Class to enter into or to renew Renewal Service Agreements that they would not have had the true facts been known to them.

84.     Defendants had a duty to disclose the facts that they intentionally concealed and misrepresented because it made general affirmative representations about their fees upon which they knew that Plaintiff and the other members of the Class would rely, as the most direct statement of Defendants' fees and charges which were made available to Plaintiff and the other members of the Class.

85.     Therefore, Plaintiff and members of the Class have suffered compensatory, incidental, and consequential damages.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

86.     Plaintiff re-alleges and incorporates by reference each preceding paragraph as though set forth at length herein.

87.     Defendants have received a benefit, the retention of which would unjustly enrich Defendants, by its conduct in overcharging Plaintiff and the Class.

88.     Defendants should be required to return that benefit, disgorge their unlawful gains and provide restitution to Plaintiffs and the Class.

## FIFTH CAUSE OF ACTION

### (False Advertising Under VA Code Ann. §§ 18.2-216 *et seq.*, and 59.1-68.3)

89.     Plaintiff re-alleges and incorporates by reference each preceding paragraph as though set forth at length herein.

90.     Virginia law prohibits the use, in any brochure, circular, or letter, of "any promise, assertion, representation or statement of fact which is untrue, deceptive or misleading" if the advertisement is made with the "intent to sell" or "to induce the public" to enter into agreements. Va. Code § 18.2-216.

91.     The website and Patent Renewal brochure are "advertisements" under 18.2-216.

92.     CPA placed both the website and the Patent Renewal" brochure before the public with the goal of inducing clients to retain CPA for patent renewal services.

93.     For the reasons described *supra*, statements on the website and in the "Patent Renewal" brochure are "untrue, deceptive and misleading."

94.     Under § 59.1-68.3 "any person who suffers a loss as the result of a violation of Article 8 (§ 18.2-214 et seq.) has a private right of action."

95.     RTS and the class have suffered losses due to the overcharges made by CPA. Members of the Class expended more money in the transactions with CPA than they otherwise would have due to Defendants' conduct.

## SIXTH CAUSE OF ACTION

### (Injunctive Relief)

96.     Plaintiff re-alleges and incorporates by reference each preceding paragraph as though set forth at length herein.

97.     Plaintiff received, and many members of the Class continue to receive, billing statements from CPA which do not contain a breakdown of charges.

98.     These billing statements do not permit CPA's clients to detect overcharges and are unfair, misleading, and deceptive.

99.     CPA should be ordered to change its policies and provide detailed billing statements to its clients.

100.    If CPA changed its billing practices, RTS might retain CPA in the future to manage its international patent registration payments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests that the Court order the following relief and enter judgment against Defendants as follows:

A.      Declaring that this action is a proper class action, certifying the Class, designating Plaintiff as representative of the Class, and appointing Plaintiff's attorneys as Class Counsel;

B.      Enjoining Defendants from continuing the unfair and deceptive business practices alleged in this complaint, including ceasing to charge improperly assessed Administrative Fee(s), "Country Charge(s)" or "Official Fee(s)" and using inflated exchange rates, and providing accurate and reliable information regarding its billing practices;

C.      Requiring Defendants to disgorge, restore, and return all benefit and monies wrongfully obtained;

D.      Ordering Defendants to pay actual damages to Plaintiff and members of the nationwide Class;

E.      Ordering Defendants to pay an award of reasonable attorneys' fees and costs of this action; and

F.      Ordering such other and further relief as the Court deems necessary, just, and proper.

Respectfully submitted,

January 13, 2017

**BROWN NERI SMITH & KHAN, LLP**

By: _____

Geoffrey A. Neri, Esq, VSB No. 72219
Ethan J. Brown, Esq. (admitted *pro hac vice*)
Rowennakete Barnes, Esq. (admitted *pro hac vice*)
11766 Wilshire Blvd., Ste. 1670
Los Angeles, CA 90025
Phone: (310) 593-9890
Fax: (310) 593-9980
Geoff@bnsklaw.com
Ethan@bnsklaw.com
Kete@bnsklaw.com

Adam R. Gonnelli, Esq. (admitted *pro hac vice*)
**THE SULTZER LAW GROUP, P.C.**
85 Civic Center Plaza, Suite 104
Poughkeepsie, NY 12601
Phone: (845) 483-7100
Fax: (888) 749-7747
gonellia@thesultzerlawgroup.com

Innessa S. Melamed (*pro hac vice* application pending)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Facsimile: (212) 983-9331
Email: imelamed@faruqilaw.com

*Counsel for Plaintiff and the Proposed Class*

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury

of all issues so triable.

DATED: January 13, 2017           **BROWN NERI SMITH & KHAN, LLP**

By: _____

Geoffrey A. Neri, Esq, VSB No. 72219
Ethan J. Brown, Esq. (admitted *pro hac vice*)
Rowennakete Barnes, Esq. (admitted *pro hac vice*)
11766 Wilshire Blvd., Ste. 1670
Los Angeles, CA 90025
Phone: (310) 593-9890
Fax: (310) 593-9980
Geoff@bnsklaw.com
Ethan@bnsklaw.com
Kete@bnsklaw.com

Adam R. Gonnelli, Esq. (admitted *pro hac vice*)
**THE SULTZER LAW GROUP, P.C.**
85 Civic Center Plaza, Suite 104
Poughkeepsie, NY 12601
Phone: (845) 483-7100
Fax: (888) 749-7747
gonellia@thesultzerlawgroup.com

Innessa S. Melamed (*pro hac vice* application pending)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone:  (212) 983-9330
Facsimile: (212) 983-9331
Email:  imelamed@faruqilaw.com

*Counsel for Plaintiff and the Proposed Class*

# EXHIBIT "A"





# Renewal Services Agreement

Patents and Designs
Quarterly Automatic Payment Service

Issue Date: March 18, 2016

## Run Them Sweet LLC ("you")
559 Nathan Abbott Way
Stanford, CA 94305

## CPA Global Limited ("us" or "we")
### Company Number 93743
Liberation House
Castle Street
St. Helier, JE1 1BL
Jersey, Channel Islands

Run Them Sweet LLC
Version 1.5

Knobbe Martens
Last Revised March 14

Patent Quarterly Automatic
Page 1 of 10



## TABLE OF CONTENTS

OPERATING PROCEDURES ......................................................................................... 3
1.    SERVICE DESCRIPTION ........................................................................................ 3
2.    INITIAL DATA EXCHANGE .................................................................................... 3
3.    ON-GOING COMMUNICATION AND DATA MANAGEMENT ..................................... 4
4.    ADMINISTRATION CHARGE.................................................................................. 4
5.    CREDIT PERIOD .................................................................................................. 4
6.    CURRENCY FOR INVOICE AND PAYMENT ............................................................. 4
7.    CPA START PAY DATE .......................................................................................... 4
8.    WORKFLOW DIAGRAM ........................................................................................ 5
9.    KEY DATES .......................................................................................................... 6
TERMS AND CONDITIONS OF SUPPLY OF COMPUTER PATENT ANNUITIES LIMITED.......... 7
1.    APPLICATION ..................................................................................................... 7
2.    FORMATION OF CONTRACT.................................................................................. 7
3.    INSTRUCTIONS ................................................................................................... 7
4.    AGENTS AND OTHER SUB-CONTRACTORS .......................................................... 7
5.    FEES ................................................................................................................... 7
6.    PAYMENT............................................................................................................ 8
7.    CONFIDENTIALITY ............................................................................................... 8
8.    RECORDS ............................................................................................................ 8
9.    TERMINATION..................................................................................................... 8
10.   FORCE MAJEURE ................................................................................................. 8
11.   ASSIGNMENT...................................................................................................... 9
12.   GOVERNING LAW ............................................................................................... 9
13.   NOTICE AND COMMUNICATIONS ........................................................................ 9

 

## OPERATING PROCEDURES

1. **SERVICE DESCRIPTION**

1.1   We will handle the payment of your patent and design renewal fees.

1.2   We will send you a consolidated quarterly renewal notice approximately three months in advance of the beginning of the renewal due period as set out in the table under the heading "Key Dates". The renewal notice will be sent by paper and/or via electronic file (if required).

1.3   You will inform us of cases that should be abandoned by the last date for abandonment as set out in the table under the heading "Key Dates". Abandon instructions may be sent to us either using CPA Direct (our online service), via electronic batch transfer or via fax or mail.  We will confirm an abandon instruction by sending you a remove acknowledgement report.  If we have not received an abandon instruction we will instruct payment of the renewal fee.

1.4   We will send you a quarterly invoice. The invoice will be sent approximately one (1) month prior to the beginning of the renewal quarter. The invoice will be sent on paper and/or via electronic file (if required).

1.5   If an abandon instruction is received after the relevant invoice has been issued, we will issue a credit only if we have not already actioned the renewal.

1.6   We will store all official receipts for you. A copy may be requested at any time.

2. **INITIAL DATA EXCHANGE**

2.1   Knobbe, Martens, Olson & Bear ("KMOB") will provide us with data for the initial data load.

2.2   KMOB will provide us with details of the portfolio in an electronic format.  We will assume that such data is current, complete and accurate.

2.3   We will analyze the data to determine data quality and send KMOB any queries where we identify difficulties.  You will be responsible for diligently working with KMOB to resolve all data discrepancies in a timely manner.  KMOB will communicate the resolution of these discrepancies to us.

2.4   Once the discrepancies are resolved, we will load the data onto the live system and provide you (with a copy to KMOB) with a portfolio file of all cases loaded. You will review this portfolio file and approve the contents within one (1) month. If you discover any inaccuracies in the listing, you will promptly advise us of such inaccuracies, and we will promptly make corrections in our system.

Run Them Sweet LLC
Version 1.5

Knobbe Martens
Last Revised March 14

Patent Quarterly Automatic
Page 3 of 10

 **CPA** GLOBAL

3.  **ON-GOING COMMUNICATION AND DATA MANAGEMENT**

3.1  We understand that new cases, grant details and other changes in status will be reported by KMOB to us in the same format as the initial load on a regular basis, but never less than once per month for as long as you are a KMOB client.

3.2  We will update data transferred by KMOB to us and provide KMOB (with copy to you) with details of the changes via a paper report.

3.3  We will update your data on our system based on data received from third parties and send you paper input reports. You and KMOB will check the contents of the reports and update your data accordingly.

3.4  Instructions can be reported by you to CPA in accordance with Clause 3 or 11 in the "Terms and Conditions" section below, or at any other time.

3.5  You can send data to us directly if your relationship changes with KMOB, but you must execute a separate renewals agreement with us. You will notify both us and KMOB of changes in your business address or invoicing address, changes to your contact information or other administrative information not related to information or data in your portfolio.

4.  **ADMINISTRATION CHARGE**

4.1  We will charge you an administration charge based on Schedule 1, attached. We will give you not less than 6 months' notice of any increase in our administration charge.

5.  **CREDIT PERIOD**

5.1  Your credit period is 60 days from the date that our invoice is issued.

6.  **CURRENCY FOR INVOICE AND PAYMENT**

6.1  The currency for invoice and payment will be US Dollars.

7.  **CPA START PAY DATE**

7.1  We will pay your renewals due from **April 1, 2016** (the "start pay date") subject to data being received from you or KMOB and loaded onto our system within 1 month of signing this agreement; if this does not occur, we reserve the right to delay the start pay date. It is assumed that other parties have paid all renewals due prior to this 'start pay date'.

# CPA GLOBAL

7.2    WORKFLOW DIAGRAM



Run Them Sweet LLC
Version 1.5

Knobbe Martens
Last Revised March 14

Patent Quarterly Automatic
Page 5 of 10



8.    **KEY DATES**

| Patent and design renewals due | | Renewal notice date[1] | Last date for abandonment[2] | CPA invoice date |
|---|---|---|---|---|
| Quarter 1 | January February March | September | 20 November | 28 November |
| Quarter 2 | April May June | December | 20 February | 28 February |
| Quarter 3 | July August September | March | 20 May | 28 May |
| Quarter 4 | October November December | June | 20 August | 28 August |

1.  We will send you only one renewal notice approximately 3 months prior to the due period.

2.  This is the last date on which we can accept your abandon instruction.  If abandon instructions are received after this date we may not be able to refund any cost of renewal.

Run Them Sweet LLC
Version 1.5

Knobbe Martens
Last Revised March 14

Patent Quarterly Automatic
Page 6 of 10



## TERMS AND CONDITIONS OF SUPPLY OF CPA GLOBAL LIMITED

### 1. APPLICATION

1.1 These conditions shall govern and be incorporated into every contract made by CPA Global Limited (**"us"**, **"we"** and cognate terms) or on our behalf with clients (**"you"**) for the provision of intellectual property related professional services (**"Services"**) and shall subject to condition 1.2 below prevail over any terms or conditions contained or referred to in any documents submitted by you or previously submitted by us or in correspondence or elsewhere.

1.2 The details of the Services that we shall provide to you are set out in our operating procedures (the **"Operating Procedures"**). We may change the Services and/or Operating Procedures at any time upon written notice to you.

1.3 Acceptance by you of, or instructions by you to perform, Services shall constitute unqualified acceptance of these conditions.

1.4 A variation of these conditions is valid only if it is in writing and signed by or on behalf of us.

1.5 No failure to enforce or delay in enforcing any of these conditions shall operate as a waiver of any of them and no partial or single exercise shall prevent any other or future exercise of that or any other right.

### 2. FORMATION OF CONTRACT

2.1 A contract shall arise between us on whichever is the earlier of our actual receipt of your instructions to act or a renewal notice issued by us and our acting upon your instructions.

2.2 Our acceptance of any oral instructions from you shall be effective only when such instructions have been confirmed in writing by letter or facsimile transmission. Electronic instructions will be accepted only if by the CPA Direct System to which separate conditions apply, or by an electronic interface approved by us.

### 3. INSTRUCTIONS

3.1 A condition to our acting on your behalf will be that you respond promptly, clearly and completely to any request we may make for instructions, information, technical data, documents and payment of fees.

3.2 Without prejudice to the need for you to respond promptly, if we need your response by a specific deadline we will endeavour to say so when seeking instructions. If you miss a deadline or send us insufficiently clear or timely or incomplete instructions we shall have no liability for any loss which may arise and we shall not be under any obligation to take any steps to preserve or to protect your rights further. Nevertheless, if at our sole discretion we take any such steps, then you shall

indemnify us for all fees, cost of work done, overheads and disbursements incurred, each of which may include premia and/or special charges to reflect urgency and disruption.

3.3 You agree that we may rely and act upon instructions from your authorised agent whose details you have supplied to us until we receive your written signed instructions to the contrary.

3.4 Subject to these conditions we will proceed on the basis that our duty to you is to do what we consider is necessary properly to protect and preserve your rights.

### 4. AGENTS AND OTHER SUB-CONTRACTORS

4.1 In order to provide the Services we may need to instruct local agents practising in the jurisdiction of each relevant registry or other independent specialist providers. The naming of any third party referral firm(s) in our correspondence is not intended to give rise to any agency relationship. Each party is intended to be a principal in its own right and the contract for the Services is between you and us only, in accordance with these conditions.

### 5. FEES

5.1 Our basic fees in relation to Services that comprise the provision of renewal of intellectual property rights registrations are set out in Clause 4 of the Operating Procedures.

5.2 In addition to our fees there will also be payable by you the charges made by the relevant registries (**"Official Fees"**) in each jurisdiction and which vary from time to time and, where applicable **"Country Charge"** which is set out in a tariff (which may vary from time to time), a current copy of which is available on request.

5.3 Any sums of money that may at any time require to be converted from one currency into the currency in which we have agreed to invoice you will be so converted at our rates from time to time.

5.4 All charges are subject to variation in the light of changes to underlying charges and/or for correction of errors.

5.5 On each occasion upon which we send you a renewal notice in relation to the renewal of a particular intellectual property right we give you our best estimate of the likely total aggregate fee likely to be payable in respect thereof (including the Administration Charge, the Country Charge and the Official Fee) on the basis that the transaction proceeds in an expected and standard manner. Your instruction to us to proceed (whether express or, if otherwise so agreed, by failure to instruct us not to proceed) shall constitute your acceptance of, and agreement to pay such fee and, if applicable, to pay later after they have



arisen and been invoiced any supplements thereto that may arise or become appropriate in the light of any unexpected work, change of circumstances or further expenses becoming necessary. We shall submit to you an invoice for the amount of such estimate after your instruction or deemed instruction to us to proceed.

5.6 VAT and any other relevant tax or duty payable, if any, by you on our supply of Services shall be added to all fees.

5.7 You acknowledge that it is our policy not to pay accumulated annuities or back fees arising in certain countries at the time of grant or acceptance of an application, and it is your responsibility to arrange payment of such fees directly with your associate.

6. **PAYMENT**

6.1 Unless otherwise agreed, payment of invoices shall be made in full within 60 days from the date that our invoice is issued. Time shall be of the essence of payment. Interest will be charged on any amounts overdue at the rate of 1.5% per month or part thereof. We may suspend the supply of Services to you where any amounts are overdue under any contract until all such amounts have been paid.

6.2 If in our opinion your creditworthiness deteriorates before completion of performance of our Services we may require full or partial payment of all or any fees prior to performance or the provision of security by you in a form acceptable to us.

6.3 We shall be entitled to offset any amount owing to us from you against any amount owed to you by us.

7. **CONFIDENTIALITY**

7.1 Each of you and we undertake to the other that it will not during the term of this agreement or at any time thereafter use, divulge or communicate to any person, except its professional representatives or advisers or as may be required by law or any legal or regulatory authority or pursuant to performance of its obligations under a contract made pursuant hereto, any confidential information relating to the other's business, financial or other affairs which is not in the public domain concerning the other party which may have, or may in future, come to its knowledge under the provisions hereof and each of you and we shall use reasonable endeavours to prevent the publication or disclosure of any such information. This provision shall not apply to information already known to the receiving party prior to its receipt hereunder or which subsequently comes into the public domain or its knowledge other than as a result of a breach hereof.

8. **RECORDS**

8.1 We will maintain records in connection with all matters in respect of which we provide the Services to you. Any file which we may open

in connection with the Services shall be and shall remain our property at all times. When we have completed the contract for the Services in respect of any matter we may destroy any related file at any time after the expiry of one year.

8.2 If you wish to have access to any of our files after we have ceased to act for you then, provided that such file has not already been destroyed pursuant to condition 8.1 above, we shall be entitled to require you to make payment of any monies then still due from you to us and in addition to charge you a reasonable fee for the work involved in giving you such access.

9. **TERMINATION**

9.1 Unless otherwise agreed, either you or we may terminate our provision of the Services by giving to the other not less than six months' notice in writing expiring at any time.

9.2 On or at any time after the occurrence of any of the events in condition 9.3, we may suspend further performance of Services for you and/or terminate any contract with you with immediate effect by written notice to you.

9.3 The events are:

(a) you being in breach of an obligation under a contract with us;

(b) you passing a resolution for your winding up or a court of competent jurisdiction making an order for your winding up or dissolution;

(c) your entering administration, the making of an administration order in relation to you or the appointment of a receiver over, or an encumbrancer taking possession of or selling, any of your assets;

(d) your making an arrangement or composition with your creditors generally or applying to a court of competent jurisdiction for protection from your creditors.

9.4 Upon any termination, any of your indebtedness to us shall become immediately due and payable and we shall be under no further obligation to provide any Services to you.

10. **FORCE MAJEURE**

10.1 Where a Force Majeure Event takes place we shall use our reasonable endeavours to carry out the Services.

10.2 Notwithstanding 10.1 above, if we are prevented, hindered or delayed from or in supplying any Services in accordance with these conditions by a Force Majeure Event we shall notify you as soon as reasonably possible and we may, at our option:

(a) suspend performance while the Force Majeure Event continues;

Run Them Sweet LLC
Version 1.5

Knobbe Martens
Last Revised March 14

Patent Quarterly Automatic
Page 8 of 10



(b) apportion available resources between our clients as we decide;

(c) terminate any contract so affected with immediate effect by written notice to you;

and we shall not be liable for any loss or damage suffered by you as a result.

10.3 In this condition **"Force Majeure Event"** means an event or circumstance beyond our reasonable control including, without limitation, strikes, lockouts and other industrial disputes relating to our workforce.

11. **ASSIGNMENT**

You may not assign or transfer, or purport to assign or transfer, any of your rights or obligations under a contract without our prior written consent. We may assign, transfer and/or subcontract the whole or any part of this contract without notice to you.

12. **GOVERNING LAW**

These conditions and any contract made under them shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, United States of America, with the understanding that any legal action taken regarding this Agreement shall be brought in a

U.S. District Court located in the Commonwealth of Virginia.

13. **NOTICE AND COMMUNICATIONS**

Any notice, demand or other communication given or made under or in connection with the matters contemplated by these conditions shall be in writing and shall be delivered personally or sent by fax or prepaid air mail (to in our case our registered office from time to time marked for the attention of the Secretary) and shall be deemed to have been duly given or made as follows:

(a) if personally delivered, upon delivery at the address of the relevant party;

(b) if sent by air mail, 5 days after the date of posting; and

(c) if sent by fax, when despatched;

provided that if, in accordance with the above provision, any such notice, demand or other communication would otherwise be deemed to be given or made after 5.00 p.m. such notice, demand or other communication shall be deemed to be given or made at 9.00 a.m. on the next usual business day in the place of receipt.

We agree to the above.

Signed for and on behalf of **Run Them Sweet LLC**
Robert Lee, 559 Nathan Abbott Way, Stanford, CA 94305

Michael A. Horning
537A Simonds Loop
S.F., CA. 94129

Signature: ...................................................

Name: ..Michael Horning..................................

Position: ..CEO.............................................

Date: ..3-30-2016.........................................

Signed for and on behalf of **CPA Global Limited**

Liberation House, Castle Street, St. Helier, JE1 1BL, Jersey, Channel Islands.

Signature: ...................................................

Name: ................Amanda Harris.......................

Position: ............Authorised Signatory...............

Date: ............**− 4 APR 2016**.......................

Run Them Sweet LLC
Version 1.5

Knobbe Martens
Last Revised March 14

Patent Quarterly Automatic
Page 9 of 10

 

## SCHEDULE 1

Service charge based on the volume of annual payments made for you. We will calculate the service charge based on the total number of fee-paying cases having a renewal due in the next year.

| Number of Annual Payments | Administration Charge (US$) |
|---|---|
| 0 - 25 | 200.00 |
| 26 - 50 | 150.00 |
| 51 - 100 | 55.00 |
| 101 - 200 | 28.00 |
| 201 - 500 | 22.00 |
| 501 - 750 | 18.00 |
| 751 - 1,000 | 17.00 |
| 1,001 - 2,000 | 16.00 |
| 2,001 - 3,000 | 15.00 |
| 3,001 - 5,000 | 13.00 |
| 5,001 -10,000 | 12.00 |
| 10,001 - 15,000 | 11.00 |
| > 15,000 | 10.00 |

Run Them Sweet LLC
Version 1.5

Knobbe Martens
Last Revised March 14

Patent Quarterly Automatic
Page 10 of 10

# EXHIBIT "B"



| Date | CPA Global account number | Client name |
|------|---------------------------|-------------|
| 09 July 2015 | 2409720 | Run Them Sweet LLC |

## Invoice R662290 continued

Total amount due
## US$ 1,693.31

| Canada | Patent application number **2889348** | Renewal date **24 Oct 2015** | Annuity **03** | |
|--------|------|------|------|------|
| Invoice item number | Type | Application number | Proprietor | Cost |
| 0001 | Large Entity | 2889348 | RUN THEM SWEET LLC | US$ 686.68 |
| Reference | | Knobbe Martens Olson & Bear case code | | File number |
| METHODS AND SYSTEMS TO ESTIMATE | | 1241806 | | RTS.001CA |

Division details
XXXXXX – DEFAULT DIVISION

| Europe | Patent application number **13848522.2** | Renewal date **24 Oct 2015** | Annuity **03** | |
|--------|------|------|------|------|
| Invoice item number | Type | Application number | Proprietor | Cost |
| 0002 | Patent | 13848522.2 | RUN THEM SWEET LLC | US$ 1,006.63 |
| Reference | | Knobbe Martens Olson & Bear case code | | File number |
| METHODS AND SYSTEMS TO ESTIMATE | | 1242988 | | RTS.001EP |

Division details
XXXXXX – DEFAULT DIVISION



## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2017, I filed the foregoing using the Court's CM/ECF

system, which immediately sent notice to the following counsel of record:

Demme Doufekias
Morrison & Foerster LLP (DC)
200 Pennsylvania Avenue, NW
Suite 6000
Washington, DC 20006-1888
ddoufekias@mofo.com

Penelope Athene Preovolos
Grant C. Schrader
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94015-2482
ppreovolos@mofo.com
gschrader@mofo.com

By: _____
Geoffrey A. Neri, Esq.
BROWN, NERI, SMITH & KHAN, LLP
11766 Wilshire Blvd., Ste. 1670
Los Angeles, CA 90025
Phone: (310) 593-9890
Fax: (310) 593-9980
Geoff@bnsklaw.com